The object of the proof is to show that the entry dated in 1784 bears a wrong date, and should be the 17th of October, 1783. We will again, as explicitly as we can, declare our opinion. The date of the entry, as it stands on the book, ought not to be contradicted, explained, or altered by any parol evidence, nor by any evidence of custom, nor yet by any other entry upon the book itself. The plaintiffs proved by parol evidence, that certain commissioners, said to be appointed by North Carolina to run and mark the military line, described in 1783, c. 3, § 7, took the latitude of the Kentucky line, in the month of February, 1784, and ran fifty-five miles south, to Mount Pisgah; and some of the commissioners ran west from that point, and others east; that in running east the commissioners discovered on the first day, that they were declining too much to the north, and supposed the error to be occasioned by the snow, and the wetting of the needle. One of the commissioners then went back for another compass, but when it came it was equally erroneous with the other. That they went on marking the line about thirty-two miles; and the commissioners there left the surveyors, who went as far as Collins' River. And the plaintiffs' counsel further proved, that a due east line from Mount Pisgah would leave the lands in question to the north, and of course within the land described by the said Act of 1783, c. 3, § 7.
The plaintiffs' counsel opened this case, and stated that the plaintiffs were entitled to recover if they had an older grant, which covered the land in question, unless the defendant had a special entry senior in date to such grant, followed by a grant thereupon. Here the plaintiffs have such elder grant, and the defendant has not such special entry. What is a special entry? It is that which gives notice, to others who see it, of the place intended to be surveyed; and no such notice was given here; for the surveyor might include the spring and be to the west, to the north, to the south, or to the east, as to all the land, except the small part between the spring and that line of the tract which was nearest. Allowing it to be a special entry, it ought to include not only *Page 62 
the lick, but also the point two miles south of the boundary line, and, if both these points be included, the land in question will not be affected by a survey, whether that survey be made in a square or, an oblong. And as to the lands in question laying to the south of the military line, they said that could not render the plaintiffs' grant void, for the Act of 1783, c. 3, § 7, does not say that the grants of the officers and soldiers shall be void if obtained for land beyond those bounds; although in the same act, section eight, grants obtained by others are declared void, which is also repeated in 1783, c. 2, § 12. And for another reason the plaintiffs' grant cannot be deemed void. The marked line relied on by the defendant is really not so. Admitting that authority was given by the State of North Carolina to certain commissioners to run and mark the line described in the Act of 1783, e. 3, § 7, the acts of such commissioners are not valid unless they have pursued the authority given them; and they did not pursue their authority in this instance, because they ran ten degrees to the north from the line described in the act; and also, because they marked only a small part of the line, and left the rest of the business unfinished, and never resumed it again, nor made any report of their proceedings to the State of North Carolina. The fact is, that, had it not been for the errors committed by those commissioners, the plaintiffs' land was really within the bounds described by the act.
COUNSEL FOR THE DEFENDANT. — The plaintiff's entry cannot be a legal one, being on a military warrant, unless the land described in it be within the military bounds, and, for this plain reason, that the law has not authorized any grant to be issued to an officer or soldier for other lands than those within the military bounds. The officers of North Carolina had no authority to issue any such grant, and of course it must be void, as any other act is which is done in the name of another by a person not appointed by the other. It is of no force to say that such grant is not declared void by any act of North Carolina; it is equally void for want *Page 63 
of authority in the doer as if it were declared void by the act in express terms. The Act of 1783, c. 3, § 7, declares that the officers and soldiers shall enter and survey within the bounds therein described, and that implies a negative, though not expressed; namely, that they shall not enter and survey elsewhere. If an officer or soldier is not confined to the military bounds, he may go beyond these bounds and survey lands which the legislature set up to sale at the rate of ten pounds per hundred, and the public will lose the price or value of those lands. One object of the legislature in separating the military lands from the other vacant lands of the country, was to prevent those troublesome disputes which were likely to arise from permitting entries to be made promiscuously by all persons upon all the lands in the country; and its intention will be defeated if officers and soldiers may go where they please, and make entries. The disputes between them, and other enterers will still remain unprevented. The Cession Act proves that the military entries could not be made beyond the military bounds, for it is provided by the act, Iredell's Revisal, 664, that if the lands laid off, or directed to be laid off, for the officers and soldiers should not contain tillable land enough for their satisfaction, the same may be satisfied on any other vacant lands, and why make this provision if these claims might have before been satisfied on other lands? As to the argument that the Act of 1783, c. 3, has not used any negative words, prohibitory of entries or surveys to be made by the officers and soldiers over the military bounds, according to the true construction of acts of parliament or of assembly, such words need not be used if there are affirmative words which necessarily imply such negative; 6 Bac. Ab. by Gwil. page 377; and here such negative is as strictly implied as can be from affirmative words. If upon this point our position be a legal one, we are still encountered by another argument on the side of the plaintiffs. It is said that the marked line is not the true military line; that the line described in the act is the true one. The commissioners appointed by the State of North Carolina marked the line as they went, and that is a proof that they did *Page 64 
not intend to run any other, and there is not any proof of such intention.
Another reason why this line should not be questioned at this day is, that the officers and soldiers, and all mankind, have acquiesced in it ever since it was run. It has constantly been called the continental line, and considered as such. It is argued that the commissioners did not finish the running and marking the Hue which they began to run and mark, and that they did not consider as binding the small part of the business which they did; especially as they early discovered the error they were committing, I would ask why did they go on marking, after discovering the error? The answer is plain. The error was so trivial that they did not think it worth while to correct it at the expense of a new line, or new demarcation; and therefore did not intend to correct it at all; they intended that to be finished, which they did.
The law which is cited to prove that to be void which is done by authority when he does not pursue his authority, is good law as to individuals; but, when applied to public law, it is not so.
If a line is run between this State and Kentucky by commissioners appointed by both States, it is binding upon the public, although it be not run exactly according to the lines described in the chartered limits of this State. I will now notice a few remarks in our entry, and conclude. It is special enough. The lands are to lie two miles south of the military bounds, and are to be upon the waters of Harpeth. Two mile? south of the military bounds is a general direction, and so is the call for Harpeth, neither of them confined as to a particular spot; but to include a certain lick is special, because it specifies the very spot which is to be included in the land to be surveyed.
Counsel for the plaintiff in reply. — It is not a good argument to say, that the line shall be considered as the military boundary, because it is marked; for suppose, instead of running ten degrees too much to the north, it had run eighty, and *Page 65 
been marked, the argument would here be equally good as it is now; and surely in that case it would be exceedingly incorrect. Of no greater force, is the argument of acquiescence. In 1784, c. 19, §§ 7, 8, the legislature declared in express terms that the officers and soldiers' claims shall be satisfied out of other lands if there were not lands enough within the military bounds. The assembly of North Carolina acquiesced, because no return was made to them by the commissioners; and the army acquiesced, because, after such express provision, it was immaterial to them whether the line were established or not, and so rightly considered. As to the difference contended for between the case of individuals and public concerns, if a small matter, of small value, when not done pursuant to authority shall therefore be void, reason would seem to require, that, in concerns of greater value, the rule should be more rigidly adopted. I deny there is any proof that commissioners were appointed by North Carolina to run the line in question.
There is no act of assembly, nor any resolution of the assembly, nor other document, to prove it. The argument, from inconvenience, is rebutted by experience. The inhabitants living near the eastern boundary do not feel any inconvenience from that line not being marked, and why may not the inhabitants to the south do without demarcation as well; at all events, the legislature can remedy the mischief, if any there be, whenever the necessities of the people require it; and is it not better that the legislature shall be at the expense of doing so, than that the courts of the country should so infringe the rights of individuals who are really within the line described by the assembly, in order to avoid the inconvenience of ascertaining where it is?
Are we permitted by the Constitution to adopt such a course, to sacrifice the rights of some individuals to accommodate others? By no means; it speaks a quite different language; private property shall not be taken for public uses, unless in cases of extremity, and then not without making just compensation; and here we are desired to bring the *Page 66 
estate of the plaintiff upon the altar, lest other individuals might at some time or other, in cases of disputes, be put to the expense of ascertaining where the line is.